Despite their long-standing use, stock buybacks have unfortunately become a highly politicized and controversial activity today. Politicians condemn the practice of returning money to investors rather than employees, while others claim that it boosts executive compensation at the company's expense. Yet, as the SEC's own staff found in a 2020 detailed empirical study, buybacks generally are simply efficient business decisions that were down to the benefit of the investors the SEC is supposed to protect. This year, however, the SEC decided to order companies to give a lengthy explanation each and every time they dare to engage in a buyback, along with detailed repurchase activity about any daily transactions. And the agency's lead justification for these onerous requirements was precisely the one that its staff had rejected three years ago—namely, that some buybacks may be motivated by executive pay. The First Amendment, however, does not allow the government to demand that companies publicly justify controversial business decisions merely on the basis of a bureaucratic hunch that someone, somewhere, may be up to no good. I thought the law was that just a request to disclose facts was not objectionable under the First Amendment. Certainly, Your Honor. A request to disclose purely factual and non-controversial information is not. That triggers outer scrutiny, which is a lower level of scrutiny, but here we certainly don't have that here. It's not just purely factual information, and it's certainly not controversial. What the Commission is requiring here is for companies to essentially come and explain to the class why they have engaged in a controversial practice, a practice that the President himself has condemned in his recent State of the Union. Well, suppose that the disclosure was that we bought back our stock to raise the stock price. That would be just a fact. That wouldn't be protected by the First Amendment. It would be either factually true or factually false, depending on whether the disclosure is accurate. It may be a factor, Your Honor, but it would certainly be a controversial fact, and also the rule would not allow you to just simply say we bought it back just to boost our stock price. The rule is quite clear that you have to provide a lengthy, tailored disclosure consistent with the company's own facts and circumstances, and that it can't be boilerplate. Where's the lengthiness of it? I'd point you to pages 78. You must know it by heart. Where does it say the rationale has to be spelled out in a lengthy way? Sure. On pages 77 to 78 of the rule, it says you have to give a narrative disclosure. It can't be boilerplate. It has to be tailored to the company's individual facts and circumstances, and then it gives suggestions for how to do so, such as going through and saying, look, here's where we might have invested the money, but we decided to engage in a buyback instead, or here's why we think it will be a better purchase than some other thing. So I think what is inherent in the rule and is required to avoid any liability under it is to engage in this careful process where you have to divulge information. This isn't just simply a check the box exercise here. This requires lengthy disclosures that do not involve any sort of boilerplate. So I think this is far more similar to the sort of disclosure requirements that the Eleventh Circuit in the net choice case found that would fail even under Zouderer, because it imposed a heavy burden to make these sort of individualized explanations any time a company engages in a transaction. Didn't the Fifth Circuit have a net choice opinion? Yes. Isn't that relevant? Yes, Your Honor. It would be quite similar to the disclosures being required here. Your Honor, we don't think net choice controls here for a number of reasons. I first just point you to the fact that in net choice, the parties, the only thing they disputed with respect to the particular disclosure analysis was whether those were unduly burdensome. The parties didn't dispute they were factual and non-controversial. The parties didn't even dispute that they were unjustified. I think you have a fair argument that this is not factual. But I ain't got arguments foreclosed by net choice, in our circuit's net choice. There are other issues here, but you're pressing that this is not factual. You can proceed with it, but I do wonder if you need to climb that hill. Your Honor, even if you think that you were foreclosed by net choice to think that this is factual, I certainly don't think that net choice foreclosed that this is controversial speech, which is going on right here. And just to discuss the context of this court's net choice decision, I think it's important to remember that what was happening there is the social media companies were bringing a facial challenge to Texas' disclosure requirements. And the way the case was litigated, it was clear that some of these disclosure requirements and some applications were not going to be controversial. So take the instance of a social media company just removing spam posting. Nobody gets worked up at all about just standard deletion of spam, which many instances were. The whole fight there, and there may have been some instances which were controversial, I think as this court acknowledged, but the social media companies had brought a facial challenge and it couldn't show that they had simply, that the Texas law wasn't valid in all of its applications. So I think that's a good way of understanding net choice. Another point about net choice, especially in this context, was it was essentially a sort of a customer service law, as I think how a lot of the parties understood it, where you essentially had to disclose at least the portion that SEC focuses on, that when you remove content, you basically have to disclose to the person that you've removed their content and give them an opportunity to appeal. Here by contrast, these companies are not only being required to disclose to their investors but to the whole world and make it a public statement, sort of explaining exactly why they've had to engage in buybacks and what their rationale might be. So I think those are a number of reasons, but I would urge you, Your Honors, if you do think that net choice is case dispositive on this, I don't think it's any secret that it's up for the Supreme Court at review. They will probably decide on whether to take it in their next conference. And if you think that net choice is outcome determinative here, I would just urge this Court to hold it, um, hold this case and stay the rule to allow the Supreme Court to rule on that case. You're, you're, you're perfectly entitled to make that argument and it's a reasonable argument. The fact of the matter is we hardly ever do that. We can do it, but I wouldn't predict that it's likely simply because that's, that's just not normally the way our court approaches the fact that there are cert petitions pending or the case may be taken. Certainly, Judge Smith. And I mean, I think that is an option if this Court doesn't want to take it. That's obviously within your discretion. Uh, alternatively, this Court, if it thinks that the net choice is dispositive on the First Amendment, could simply approach this case using arbitrary and capricious review and hold the rules. That's a completely alternative ground for you. Yes, Your Honor. I hope you'll spend some time on it. Certainly. That's your planning team. Yeah. So I'll walk, we've highlighted a number of arguments in our briefing for why we think this rule is arbitrary and capricious. And I'd like to spend my time today on, I think, at least three. And so, and one of them, I think, dovetails with the First Amendment, but to the extent you're more interested in the arbitrary and capricious, I'm happy to spend it there. First we don't think that... I'm not, you have plenty of time, so I'm not going to dissuade you from arguing any point that you want to. We just asked some questions to kind of move the argument along. Sure. So turning to the arbitrary and capricious aspect, I would just point you to the fact that we don't think the SEC satisfied the APA's requirement of reasoned decision-making in how they explained the rule's benefits or tried to justify them. And I think on, essentially, the SEC has two main benefits for the rules. The first one is to ferret out opportunistic buybacks or buybacks that are supposed to boost executive pay at the company's expense. And at least from the briefing, I understand my friend on the other side to essentially have abandoned that point. And I think now the real focus is on the secondary rationale given by the agency, which is essentially, oh, well, this is going to help investors learn new information that's available to the company, but not to investors. And so they relied heavily, I think, especially in the brief, on this informational asymmetry aspect. And I think one major problem with that is that part of it, there's an incoherency and an inconsistency in how the agency approached this question, specifically with respect to would these requirements divulge confidential information, proprietary information. And I think you can easily see this in the rule's discussion of its costs and its benefits. When it came to its benefits, the rule touted that, look, one of the benefits of this rule and one of the ways this is going to help investors is that it's going to force companies to reveal information that they would not want to disclose because it would go to their competitors and thereby harm them. And then several pages later, when addressing costs, the agency said, well, we don't think that there's going to be any proprietary information disclosed. And I think that's just sort of a fundamental inconsistency that can't be reconciled with the APA's requirement of reasoned decision making. I think this court addressed a similar sort of internal inconsistency in the Chamber of Commerce case versus the Labor Department. I point you to that as sort of an example. But I think it's sort of a black letter law that agencies can't rely on internal decision make, internal inconsistency where they opportunistically justify the costs and benefits to suit their own ends. And I know my friend on the other side does say that, oh, look, well, there's a distinction here, right, between, you know, oh, some information might be, you know, useful for investors but not for competitors. But as a practical matter, that's not what the rule says. The rule equates the two. And I think sort of relying on this sort of novel justification would be a clear Chenery problem that can't excuse the issue under the APA. I also just don't think it works as a practical matter because if you're disclosing proprietary information, it's going to be picked up by both investors and competitors. And I think the SEC at the least has to acknowledge and treat those costs the same when it comes to benefits and to costs. So that would be my first point on arbitrary and capricious. The first point is internal inconsistency. Correct me if I'm wrong. Under the cost section, they're saying relatively small costs. But under the benefits section, they're saying actually no companies are really doing it yet and therefore the proper inference is it's proprietary. There would be a significant cost. Is that roughly the inconsistency? Quite specifically when it comes to information asymmetry, that when it talks about benefits, the benefits is you're disclosing sensitive internal information and the costs, they are then saying the exact opposite and that they are not disclosing. Benefits were, our primary goal is to protect investors and investors have no real reliable information to know why $970 billion of stock repurchase occur each year. So we're going to give them a little bit of information. It's not going to be every day, it's not going to be that burdensome, it's going to be every quarter. We're going to enhance the disclosures so they've got to give a rationale. That doesn't sound to me like the SEC is saying you've got to give out proprietary information. For example, if they just, I know you may disagree and maybe I'm wrong, I need to look at it. You're saying there's a lengthy narrative that's required. I would have thought you could suffice by just saying our stock's undervalued. Or we have excess cash. And you think that would be violative. There's no proprietary information in statements like that. So I don't think the rule would allow that or there would at least be a significant risk. And I think in the preamble, because what the SEC was doing, it was responding to comments quite specifically that were saying, look, what's going to happen here is if you're just going to have this requirement, this is unnecessary, it's problematic because it's just going to result in boilerplate disclosures like the one that you just illustrated. We have excess cash, that's why we're doing it. So the agency said, we don't expect that there will be boilerplate disclosures. It emphasized that you have to set forth a tailored circumstances narrative and explain exactly what you would do, why you're doing it, what your other opportunities are. But there's nothing they're saying that says you've got to disclose proprietary information. It really could just be, we're really confident in our company. We think the stock price is too low. So we're going to buy some of our stock. That would be violative of this new rule? It would certainly be a risk based on how I read the preamble to this rule, Your Honor. And I think it's quite clear that the agency adopted it to engage in a sort of fulsome narrative disclosure of all sorts of facts and circumstances. Go to your second point. I don't mean to— No, but just to follow up on that, you don't necessarily have to take my word for it, Your  The SEC acknowledged that one of the benefits of its rule was that it was going to reveal internal proprietary information. It thinks that its rule is going to release this. So it quite clearly says that as sort of the main benefit of the rule with respect to investors. So you don't need to take my word, I think— Is this part and parcel with there are litigation costs to the new rule? Not necessarily. This is part of their analysis of the costs and benefits of the rule more generally. When talking about the benefits, they are saying, look, we're going to reveal proprietary information. When it comes to costs, they say, well, we think, look, commentators have raised the concern that you might be able to disclose proprietary information to commenters, but we don't think that's going to be true. Those two things are mutually exclusive. But just going on, moving to my second point on the arbitrary and capricious, we think that SEC failed to adequately quantify the effects of the rule, especially when we gave them the data and the ways to do so. It didn't need to do an aggressive cost-benefit analysis, but it at least had to make some sort of estimation based on the readily available data, and then address that in weighing whether— About that, I'm about to cut you off, I apologize. You gave them data. You seem to have given them, at least in part, an explanation of how the SEC could run the  process, how they themselves could figure out what the cost-benefit to this was, as opposed to, at least I see one of the responses by the SEC is that, or at least one of the responses in the brief, is that we don't have to conduct our own studies. But if you had pointed us to some studies that would help quantify what you're talking about, how often one thing happens versus the other, and how you could get a handle on that, what's your answer to, they don't have a responsibility to conduct their own studies, but if you had studies you could give them, that would be a different story. We think in the, this is the latter context, that we did give them studies, we cited them to these publicly available— Didn't you cite one study, or were there multiple studies you cited, one in England that could be extrapolated? Right, there was one of those, I'd point you to, I think you can look on pages 66-67 of the appendix, as well as 72-73, where we discussed multiple ways of doing this. One was the study in England. We also pointed to other jurisdictions where there were more frequent reporting requirements, and how— Why would you say the law is? So, I say the law is because, remember, we're not just dealing with ordinary APA review here. The SEC has a special duty, under its organic statutes, to engage in at least a more fulsome analysis of the effects of a rule. And here, we gave them the data, the SEC doesn't dispute this burden. It says, look, we will quantify to the extent we can, we acknowledge our duty, we acknowledge that's what we're supposed to do. But instead, when we gave them the information, it didn't engage in any of those studies. In fact, it didn't even respond. So I would just say, at a minimum, the SEC at least could have said, here's why we're not relying on what the Chamber and others have provided to us. Here's why we don't think these studies— I thought they did. I'm not saying it's satisfactory, but I thought they specifically said, we're not responding because the disclosure rule in its current form doesn't give us that data. And then the SEC's comment is, well, you can look at academic journals, you can look at other jurisdictions. That's where you could look to generate the statistics. But is there a case that says it's arbitrary and capricious when a commentator says, here's a way to generate more statistics, and they don't do that? I think I'd point you to the Chamber of Commerce case from the D.C. Circuit along with Business Roundtable, also from that court, as also the Bloomberg case more recently, at least with respect to my point that you have to address those comments even if you disagree with them. And I think they highlight that, look, when the SEC is easily able to estimate these sorts of costs, they at least need to try and engage—it doesn't need to be a perfect quantification, but they at least need to engage in the exercise. And at an absolute minimum, they need to say why they're not going to. They need to say why they don't think these studies are worth it or why they can't do it. And the record is silent here as to why they did that. So I think that would be another problem under the APA's reasoned decision-making requirement and under the SEC's organic statutes. And then—so I would just point you to those. Turning finally to the third APA problem that we see, I think it goes to the excise tax. And here I think this is—I'd narrow the issue specifically to the fact that in analyzing the effect of the excise tax on the proposed rule, the SEC relied on its staff memorandum. The staff memorandum, however, engaged in this analysis with respect to the proposed rule rather than the materially different final rule. And the SEC, in relying on this analysis, didn't update it to account for the final rule. And you can look in its discussion, and it's essentially, look, we agree with the staff. We think that the excise tax shouldn't have a material effect. We're going with that. But it had to actually engage with the changes that had happened from when the rule was proposed to the final rule. And as the SEC noted elsewhere in its rule, one of the major changes that had happened was that the proposed rule had imposed this daily data requirement to be done the next business day, whereas now it was just requiring the daily data to be published on a quarterly basis—or, excuse me, monthly basis. So I think relying on that is another example of unreasoned decision-making. At one point, before I forget, just on the justifications, and I think this goes back just to make sure I close—it's not just limited to the internal inconsistencies, but the fact of the matter is most of this rule—I think you can look on page 22 of our reply where we have all of the various sites—most of this rule relies on this assumption that there are these improper buybacks going on, that they need to be ferreted out, and I just don't think the SEC has come close to its burden under the APA to show that this was some sort of harmless error here, that having relied on this justification, they've now largely abandoned, if not entirely, and I just don't think we can have any degree of the SEC would have adopted this exact same rule had it not been for this concern about improperly motivated buybacks, which, at this point, the SEC doesn't seem to be too concerned about.  Well, so what is the particular flaw in that? Assuming that everything you say is right, which of your points is that addressed to?   That's in the first bucket, which is the fact that they didn't adequately justify the rule, and that if you rely on a premise that—and the premise here was that there are these problematic stock buybacks, we need to ferret them out, and now, faced with evidence and faced with the fact that there's just not really support for that, they're abandoning that. I don't see how that's reasoned decision-making if the rule rests on a predicate that's actually false or at least abandoned. So I would point you to that as well. I mean, to the extent—I'll just return to the First Amendment, given that I have some time at this point, and I do really think that the points about justification do go to why the rule also fails under the First Amendment. I think even if you analyze the rule under Zouderer, I think this rule is unjustified. The SEC hasn't pointed to really any justification that would suffice to uphold the rule under Zouderer. I think if we're talking purely in terms of investor uncertainty, that would be—or information asymmetries, that would be true in any particular rule. There's always some sort of asymmetry between the company and its investors, and if that's enough to justify disclosure rules under the First Amendment, it's hard to see the stopping point. I mean, the SEC has relied on similar arguments in its proposed climate change rule pointing to informational asymmetries and investor uncertainty and the like. And so I think however this Court disposes of the First Amendment, it's just hard to see how we can say that this rule is justified under Zouderer without essentially giving the SEC a green light to impose all sorts of disclosure requirements in this context. I also think that even if you found it were somehow justified, the rule is particularly unduly burdensome. Again, I'm talking about this rationale disclosure requirement. For starters, it does require companies to come out and publicly defend controversial business practices, and in doing so, it is this sort of—I think you see the same dynamic here that was going on in the conflict minerals case, where it's this sort of name-and-shame regulation where you have to come out and explain to yourself, explain to the public why you've engaged in this favorite practice. And I think that's an inherently burdensome requirement imposed on speech, and I also think it puts companies in a catch-22. As we've discussed a little bit, on the one hand, in order to satisfy the rule, you have to give a narrative form disclosure that can't be boilerplate and has to address the different forms of what you would do with the money that—otherwise in investing in stock. So companies on one hand are going to be concerned about that and getting hit with liability on that end. On the other hand, they don't want to divulge proprietary information. So they're going to be constantly walking this fine line on how to craft their speech, and I think that is also an inherently—an unduly burdensome requirement, especially since the rule doesn't have any sort of benefits other than the SEC's speculation that this may help investors somewhere and somehow. And if this Court doesn't have any further questions, I'll reserve the remainder of my time for rebuttal. We have safe time for rebuttal. Thank you. Thank you. All right. Tell me whether it's Wieman or Weyman. Weyman. All right. They have you outnumbered, but it's your turn. Good afternoon. May it please the Court, my name is Theodore Weyman, and I represent the Securities and Exchange Commission, which adopted the challenge rule amending existing disclosure requirements for issuers repurchasing their own shares. Rule requires that repurchase data that's currently disclosed by issuers on a monthly basis, aggregated, be broken out day by day, along with the disclosure of the objectives or rationales driving the repurchase, along with other information that's not challenged here. Now, the Commission had two primary reasons for requiring these enhanced disclosures, and they are essentially undisputed here. First, issuer repurchases are significant market activity, as Your Honor mentioned, nearly a trillion dollars in value in 2021. That sends signals about the value of the issuer and its stock. That's not disputed. In fact, petitioners point out the positive signals it can send. And the disclosures will allow investors to better understand the meaning of those signals and make more informed investment decisions. Secondly, it's undisputed that repurchases can personally benefit corporate managers, and the more detailed disclosure will allow investors to better assess whether management self-interest was a factor in a particular repurchase. Just to be clear, because the briefs battle about it in oral argument, you're not abandoning the opportunistic theory as a basis? Absolutely not. But would you also agree that Congress asked you to look at it, and will we find substantiation for it as a reason? Absolutely. Where would we look? I think it's the framework where we disagree. Petitioners sort of characterize this as the anti-management, anti-buybacks, management malfeasance rule. It's not that. It's an investor rule. It's aimed at investors and informing investors about the meaning of a repurchase. The point being, much like a conflict of interest situation, where there's incentive to use repurchases to boost pay or even private position. I guess I'm just asking, was it substantiated anywhere, or did you not need to substantiate that this behavior is occurring? What was substantiated was that a reasonable investor could conclude, based on the evidence, that there is potentially a factor in any particular repurchase. The commission cited studies where there was an association shown between an executive pay and the decision to make repurchases, where it would boost, you know, sort of put it over an earnings per share level that would create compensation incentives for executives. The commission looked at the 2020- How does that answer tie in to this whole position the commission took, that the problem was not quantifiable? Well, there's, I think there's a distinction between the quantification of the costs that the rule could impose and sort of the bases on which the commission saw that there was an issue that required, or called for this rule to sort of clear up misconceptions that investors could get. The commission cited, relied on studies showing that, I think the 2020 SAF study showed that, you know, something like 18% of the surveyed companies could, did potentially tie compensation to buybacks. There was an association between buybacks and an effect on pay. And certainly, there's no dispute that this is something where executives can benefit. I mean, it's not disputed that some compensation programs would be triggered by an increase in stock price or earnings per share that could be affected by buybacks. So this is, you know, in a sense, on this front, it's really to inform investors about the potential factors that drive a repurchase. And it's not just the potential for, you know, executives boosting their pay. The commission cited many reasons for why companies engage in repurchases. And I think this also goes to the question of whether lengthy disclosures are required. I want to point out that this is a facial challenge to the rule, you know, and there's no requirement that, of any particular length. And the examples given by the commission, on page 79, you know, it's some examples of things that would comply. For example, that, you know, there could be a view that the stock price is undervalued. It's particularly low. And there could be other ways of using the cash. For example, you know, we could be, you know, excuse me, investing it, but— The rule contains statements that our stock price is too low. That's a sufficient explanation. I think that would meet the rule for sure. You know, yeah, I don't see any reason why that wouldn't be the case. I think, you know, this is—issuers are allowed to put this in their own words, and I think that's another reason why it doesn't pose a First Amendment burden, which is obviously a separate question. But this is, you know, this is not the government putting a label on the speech or saying you have to say this to put the government's words in your mouth. This is just simply tell the reason, what's the objective of this activity in the market? And I think it's also important to remember that, you know, this is a significant piece of information. I mean, repurchases send a signal that could be for deploying excess cash, set price support for the stock, distributing instead of dividends, we're going to distribute money to shareholders in this way. And investors, you know, they look at repurchases just like with any information in the market. You know, what does this mean for the value of the issuer, and what does this mean for, you know, future investment opportunities? So this is purely a disclosure rule that builds on existing requirements. I know you've got plenty of time, but so that's—so far you're talking about why it's a reasoned explanation for the rules. Yes. But opposing counsel did specify three points of APA concern, but you can choose your own model. Yeah, yeah. No, absolutely. You know, I think— The first one is concerning. The first one is concerning the proprietary—the risk of proprietary exposure. And opposing counsel suggested that the commission said this was a benefit of the rule, that it would expose proprietary data. And that's not accurate. The commission specifically said on—let's see, pulled it out here—page 78. In response to that concern that some commenters raised, the commission responded to that concern by saying, the final amendments do not require issuers to provide disclosure at a level of granularity that would reveal any competitive or sensitive information beyond what may already be gleaned from disclosures regarding the business and financial condition of the issuer. This isn't at a level of detail that should expose any, you know, sensitive or proprietary information. This is simply why did you engage in the repurchase. And there is no contradiction between the, you know, the benefit that that information gives investors who are assessing the stock, who, oh, this is about the low stock price. The company—you know, the company has—the issuer has better information about, you know, where it views it stands in the market. And when an investor sees, oh, they did it to, you know, because they thought that the stock price undervalued the company, that's significant to an investor, perhaps. You know, it depends on the investor. But that's information that's important. But the position that you express really has no limit because any information given to potential investors could potentially be helpful, or I understand it could be trivial, which is we're going to repaint all the offices blue instead of green. Obviously that would be the kind of granularity that we wouldn't even need to spend any time on, but information such as we're going to enlarge plants X, Y, and Z because we think that's a good thing to do. Investors might find that useful, but that's not a required disclosure. And I'm talking about non-proprietary type of things. So what's the limiting principle that all information is good and helps potential investors? I think you always have to look at what that information relates to and the purpose. Here, this is disclosure about an act that the company took in the stock market. It is an issuer. You know, issuers are regulated when they put their shares into the market with an IPO. And this is a case where an issuer is taking shares essentially out of the market, buying them from shareholders. Significant activity that's obviously of significance to the economy. It's a trillion dollars in activity. And so this is information essentially that concerns an actual activity in the stock market. And so that, you know, investors, the commission's mission, you know, obviously includes investor protection and fair dealing and securities. And this is something that goes directly to that, which is, you know, how can investors access sort of the information they need to value stocks? And this is a case in which, you know, the commission found that the signals sent, they're difficult to decipher because, you know, the disclosure requirements in 2003, you know, increased the information available, but at the monthly aggregated level, it's difficult to sort of tie that to certain events in the company and financial records, things like that. And the daily detail, which again, I'll also note that the commission changed in response, heeded commenters and didn't impose a next day disclosure because, you know, commenters thought it would be burdensome and the commission thought, you know what, this rule would be warranted with periodic disclosure of that daily detail. And so with that detail, you know, it's information that allows the investor to make better informed decisions about the value of the stock with respect to a literal stock transaction. So I think, you know, if you can imagine just things that have, you know, our business matters that are unrelated, I don't think we're anywhere near there because this literally relates to a specific securities transaction. So going to the, just to those specific three things that petitioners raised. So the proprietary interest, there's a difference in what the interest of investors, you know, in getting this information that sort of what's the purpose among these five or six major purposes that, you know, buybacks are usually for, and I'm not limiting it specifically to that, but it's well-recognized in the market that buybacks can be for certain purposes. That information to investors is significant. That's a benefit, getting that information, but the commission found that that isn't of competitive significance. It wouldn't, in terms of, you know, releasing proprietary or sensitive information, it doesn't get to that level of granularity, and there's no contradiction there. The second point is the quantification of the five studies that they suggested, and, you know, those suggestions were in an analyst report attached to their first comment letter, and I think the key point with those studies is that of the five, three of them related to quantifying the costs of next-day disclosure. That is, you could do this study to determine how burdensome, how costly it would be to require next-day disclosure. Commission didn't adopt next-day disclosure. The final rule adopted periodic disclosure. So the three of the five just on their face are not, are essentially mooted by the change in the final rule. The other two concerned the frequency or the relationship between executive compensation plans and buybacks, but they were duplicative of what already existed. I mean, one of the suggestions was there's this UK study, you could sort of recreate it in the US with US data, but the commission cited and discussed the UK study, the price order study, and found that it, you know, even assuming that it's accurate, and it doesn't need to be recreated because it's not relevant to the specific question that justified the rule, which is, is there an opportunity? Is there incentive? Is this something that buybacks can affect in executive compensation, and would it be reasonable for an investor to be concerned? Would it muddle the signal that in a particular case, even if it's driven by totally, you know, shareholder value-maximizing reasons, you know, investors might not be able to rule that out because there's not enough information. But the fact still is, if I understand the record here, that the commission had said, we don't know how to do these studies, we don't know how to quantify this, and yet you were presented with studies that did just that. Whether you agree with them or not is another question. Sure. Well, the commission considered all of the studies that were put before it. What this regards is suggestions that the commission could sort of create one new study is to create data that doesn't already, you know, isn't already analyzed. You say the commission considered all the studies. So the Chamber of Commerce meets, sends in comments, they meet with your people five times. Yes. At some point, they recommend these different avenues that could generate statistical evidence. Is it correct to say you didn't then do those? They didn't do it. Right. They didn't do it. You didn't do it. That's right. But those specific avenues for potential studies that have not yet been done, the commission didn't do and is not obligated to do. Okay. Well, that's the important thing legally then, because they say they, I think I heard him say it's not obligated under the APA, but there are SEC specific statutory mandates to quantify. And maybe, therefore, oh, let me finish the question. Yeah. So under SEC specific statutes, if they invite help, wouldn't it be violative of either the APA or the SEC statute to then be given that avenue of help, but then not remark on it? Yes or no? No. It wouldn't violate the SEC statutes. The SEC statutes require the commission to consider the effects on competition capital formation. And it doesn't require the commission to sort of conduct new studies. The commission considered the effects on all of those things, given the data before it. And the process by which that consideration under the SEC statute takes place is governed by the APA. It's governed by traditional agency principles. That's the question it considers versus how it doesn't. You know, the cases you cited, the two D.C. cases. Yeah, yeah. Those cases say that the commission must determine as best it can on the record before it. It doesn't impose an obligation to sort of conduct a bunch of new studies. I think what's also important to note is that here, there was no basis for conducting any new studies. I mean, they're pointing to three things that, three suggestions that related to something the rule didn't adopt. And two suggested studies, one was duplicate a U.K. study, which the commission considered that study. And the other one was try to further glean how often the compensation plans are tied to buyback, provide for the possibility of compensation being boosted by buybacks. And the commission considered the staff study in 2020 already looked at that and found, I think, 82 percent either didn't consider it or took it into account with compensation, but 18 percent were rife for that possibility. So, the data before the commission was sufficient to make its analysis of the rule. But counsel, let me ask you, certainly there was a fair amount of this case, season B, may rise and fall on the SEC's assertion and what we make of it, that the effects of this were not, could not be quantified. And you can tell me that's not quite the way you look at it. So, you get ways potentially to quantify. So, I guess this is really more of a legal question, but you can answer it in a wider way than that. What is the SEC's obligation when they say, basically, it would be helpful to be able to quantify, nobody's given us studies already finished that do that, and we're not going to do them ourselves. Is that, is that how the law, as you see it, works for the SEC? Well, what the law is, is that the commission should quantify if it can, based on the record, and where it can't, it can engage in a qualitative analysis. Now, that doesn't mean that the qualitative analysis, you know, can be, you know, off the wall. It has to engage in a reasoned qualitative analysis. I think what's important to remember in this particular rule is that the quantitative debate about the cost of the rule, mostly related to the next day submission, which wasn't in the final rule. All three of, you know, two of their suggestions related to, you know, the connection between executive compensation and buybacks. The three that related to the potential cost of the rule were all about the frequency of  If you look at the suggestions there, you know, study how frequent disclosure in other countries could create costs. The commission didn't adopt that. So as far as it goes— They didn't adopt that because they were treated to the quarterly requirement only. Yeah, the commission decided that it would not go with next day disclosure. Based on those, the data from those, do they say you're right? I don't think the commission expressly decided that. If I recall, the rule said, you know, we're simply not going to, you know, change from the proposal. We're requiring periodic disclosure. You know, it'll provide a little bit less benefit for investors, but, you know, it'll provide a lot less cost, and I think the point there would be in a lot of the responses to certain cost contentions, the commission was like, that's, you know, that's sort of negated by the change the next day. I don't want to overpress this point, but if I remember, at one point the response was, we haven't been able to quantify because that's the whole purpose of this rule. The existing current disclosure rule gives us too little. So that was an answer to the SEC. Yes. Am I oversimplifying it to say that then the chamber said, well, then look at jurisdictions that are, require more for disclosure, wouldn't they give you the answer? And if they did offer that broad statement, if that's accurate, um . . . Well, I would say that the commission did look at those foreign, I mean, it studied them, and it, with respect to the foreign studies, it talked about, you know, the difficult, the caveat that it's difficult to compare macroeconomic conditions, different regulations in different countries. But the commission considered that. The commission considered the PricewaterhouseCoopers UK study. So the commission looked at all that, all that, all that, all that evidence. I think what they're suggesting is the commission was required to sort of recreate studies and go down some of these paths where, where there's, you know, the existing studies already addressed all of this. So I don't think it was necessary, and in particular, the fact that in this case, those three, those three suggestions related to next day disclosure, I, I think ends the matter. Um, but the qualitative, you're right in, in pointing out that, um, the commission found that the lack of the, uh, day-to-day disclosure in, in the United States does pre, present limitations. Um, and the commission engaged in a qualitative analysis of, you know, the possibility, for example, that repurchases will decrease as a, as a, as a result of the rule. Things like that. And those aren't the sort of cost concerns that petitioners raised, uh, uh, or anyone else really. I mean, there, there, there's, there, there are cost concerns that could be evaluated based on qualitative, uh, factors, uh, you know, how this could affect, um, participation in, in, in the market and that, things like that. So, um, I don't think that the commission's, uh, I'm sure, I'm certain that the commission's analysis of qualitative factors was sufficient to, um, you know, disclose its thinking on the costs and the benefits of the rule. The commission explicitly concludes that the direct cost of preparing these reports is likely relatively small. Is that their conclusion? Uh, the direct costs are, yes. They're, I think that they're incremental with respect to individual issue, uh, individual issuers. Uh, in the aggregate, of course, there's a lot of buybacks, a lot of companies, and it adds up. But with respect to each individual issuer, I, I, I think that makes complete common sense because there are, these issuers who are doing buybacks are already under a requirement to disclose on a monthly basis all of the buybacks.  This simply requires them to break it out day by day and add a rationale and objectives disclosure. But they're already doing these filings. Um, this requires it to be on, on a periodic basis. Um. How's it going to affect this October 1st? I think for the first batch of, for some, one of the set of the companies, it's with the quarter that begins on October 1st, uh, running through the end of the year. That's right. Um, and I'll just point that the excise tax was their third, uh, you know, inconsistency. But I mean, the, the staff memo analyzing the effect of that on the proposed rule, the staff is not the commission. The commission is separate from the staff. It, it even included a caveat in the beginning of the, uh, release talking about how the staff is, you know, memo is like any other consideration. I mean, every single study that was submitted, you know, was pre-final rule. Noth, none of it considered the final rule. The commission itself conducted its own analysis of the excise tax and it referenced staff's  But what the commission found was that the, the excise tax effects would likely be, or to the extent it has an effect, it would be potentially decreasing the number of repurchases. And to that extent, it's, the commission found that any decrease in repurchases generally would be no different from, uh, decreases for other macroeconomic reasons, which the So the commission considered the, you know, the effect of the excise tax on the rule as a whole. That it considered a staff memo and, and used it as to extrapolate from, there's nothing wrong with that because, I mean, the commission, you know, can't just keep resubmitting its rule for, for comment over and over again or get, you know, reanalyzing everything over and over again. Um, you know, it has to have the ability to, you know, invite comment and, and do a final rule that maybe makes changes, um, this, you know, that based on the comments that it received. And it did so here. Um, I think the, the, the last point I want to make is with respect to, you know, um, net choice and the First Amendment point. Um, I think what's significant to remember is that there was no dispute with the Eleventh Circuit that Zotera applied specifically with respect to the disclosure requirement, the disclosure of the reasons for engaging in content moderation. The Eleventh Circuit agreed Zotera applied. It found that the undue burden, um, aspect of the Zotera test wasn't met there, but it didn't disagree with the Fifth Circuit there. Um, and what, what's, I think this case doesn't present, it's not as fraught as that case, which involved arguments that there was sort of a expressive interest in the platforms themselves engaging in content moderation. Arguments that it said there's editorial judgment involved, that they're main, you know, sort of, uh, um, uh, maintaining what, the posts that are on the site. There's, this is not a communicative act. Uh, purchasing securities on the market is a simple securities transaction. And I think that distinguishes it from every other case that they cite, which talks about, you know, when, when someone's engaged in expressive conduct, the government comes in and says, you have to say this, you should add this to your disclosure. Nothing like that is, is, is presented here. So this is a far easier case than, than even Net Choice, which A4CRE already found that this kind, you know, disclosure of the reason for engaging in an act is factual and is, is uncontroversial, even if it relates to something, um, that's, could be a topic of broad debate. Um, and I think, um, opposing, Herbert Opposing Council say that Net Choice doesn't affect the controversial question, but I don't think that's true. I mean, content moderation on a social media site is extremely controversial writ large. Um, but the fact is, a particular reason for engaging in a particular content moderation decision, this court found, was factual and uncontroversial. And the 11th Circuit didn't disagree on that point, um, that the fact of why you were doing a commercial act can be a fact and is a fact in that case, um, and here. Um, I'm trying to see if there's anything else that I was going to point out. I think, I think that, um, does it, but if you have any further questions. Um, I don't, don't infer anything from this, but I'm just curious, if we were to find that it were, that, that the rule, the final rule is improperly promulgated at the remedy level, would it be nationwide, would it be 5th Circuit specific, party specific, or would you be arguing, you've seen so much scholarship about this, vacater, uh, non-vacater just being, where's the government on, if there's an APA violation, what the remedy is? Um, well, I, I, I guess it's hard for me to evaluate in the abstract. I know, of course, you're not. Well, and also because, you know, um, I guess it would, part of it would be, would relate to exactly what the basis for the APA violation would be. Um, I think if there was, you know . . . Arbitrary as to notice in common, that they gave . . . Well, you, you know, um, with respect to . . . Insufficient consideration of . . . Yeah. . . . vehemently argued . . . Well, I, I think, you know, um, I'll, I'll point, you know, I, I was actually, he, um, the Housing Council referenced the Bloomberg case, and I was involved in that, I actually argued that case, and there, the D.C. Circuit held, upheld the entire rule, but found that one specific thing hadn't been considered, and remanded it to the Commission for consideration of that particular issue. So, I think, you know, that could be an example for if there's a very specific thing that the Commission, you know, should reconsider, um, then that would be a, an avenue.  Thank you. All right. Thank you, Mr. Wiley. Lucas for the vote. Thank you. I have five points. So, the first is, Judge Smith, I think you're absolutely right that this has no limit what the government has proposed here, what the SEC has proposed, is there is no limiting principle to the sort of rules and compelled disclosures it could insist on if its theory were adopted, that all you need is some sort of customer interest. I heard my friend on the other side say, well, it has to be tied to a transaction. But under that logic, you could have the SEC mandate anything from, say, oh, we see that you're investing in fossil fuels rather than renewables. Explain yourself to all sorts of controversial requirements. And so I think that's particularly problematic, and I think it underscores the stakes here. And just touching on that with the Compelled Speech Act aspect, I know my friend says that, look, this isn't a communicative aspect. The transaction itself isn't. Yes, but the disclosure is. And we are being forced to publicly defend ourselves and explain why we've engaged in a practice that the President has condemned as an outrageous and not the right thing in his State of the Union that members of Congress have tried to outlaw and that there is an excise tax imposed on it precisely because it's such a disfavored practice. So I think that it clearly shows some of the stakes here. Turning to the— Your response, which you may have been about to give us, to the SEC's answer to your concern that this is very detailed, proprietary information that has to be revealed? Your Honor, I heard that, the representation from my friend on the other side, but when you look at the actual rule, I have it right here, and I can point to you. On page 77, it says, look, first of all, issuers have to provide any information necessary to make the required disclosures not misleading. It says the disclosure should convey a thorough understanding of the issuer's objectives and rationales. It also says that, look, they must provide investors with sufficiently detailed information to evaluate a share repurchase, and they must be appropriately tailored to the issuer's particular facts and circumstances. The issuer shall do this required disclosure without relying on boilerplate language. It must discuss or can discuss as examples other possible ways to use the funds allocated for the repurchase, such as, per Senator Warren's suggestion, investing it in employees rather than shareholders, and comparing the repurchase with other investment opportunities that would ordinarily be considered, such as capital expenditures, other uses, discuss other prospective internal growth opportunities. This goes on for pages and pages, so I just think it's a bit startling to hear the SEC now say, oh, you can just do sort of a pro forma and boilerplate disclosure, and I think that just underscores that this is a Chenery problem here, that he's defending the rule not on the grounds the agency gave, but on the grounds that work well in litigation. And turning to another Chenery problem, I would just want to highlight the fact that Sorry, just so I follow, because I'm eager, we're on point number three? This would be point number two. Okay, the first point is no limiting principle. And that's tied to the First Amendment, yes. That's tied to the First Amendment. Then you said this is communicative because of the explanation. Yeah, that's a subset of the First Amendment, sorry. So you can break it down to six points. Now you're moving to the APA. Right, and then my second point was the boilerplate issue, just clarifying that, because I wanted to get to that, and I really do commend your attention. Just read pages 77 through 79 of the rule. But turning to this quantification discussion, and I think this is another instance of a Chenery problem. Look, I heard SEC's counsel give a very lengthy and eloquent discussion of what the Commission thought about all these various studies and what these studies were. The problem is none of that appears in the rule itself, and I think at the very least what the SEC could have done was gone through and explained why it thought this data was insufficient and why it wasn't relying on it. Especially when, as Your Honors have noted, the Commission invited this data, right? When it proposed the rule, it said, look, we recognize that we're supposed to quantify the effects of this rule to the extent possible. We don't have enough information, and we would like commenters to come forward and provide us with evidence. And we did that, and when we did, the Commission didn't even give us the time of day of explaining why it disagreed. He's saying a significant subset related to what actually was adopted in the final rule. What would help me just with limited time, what is the single study that you think is the most pertinent that was not acknowledged? Sure. So I would point to at least the data discussed on pages, I think it's 72 through 73 of the appendix, where discussing ways of how to measure investor uncertainty on that aspect of the rule, given how heavily the SEC relies on it. And I think that is particularly helpful. I'd also just point you to the data of how you could extrapolate opportunistic buybacks from these other studies, and those, I think, on pages 66 and 67 of the appendix. And I think those point, I mean, my friend can go through and quibble as to each of these, but the SEC could at least explain why it wasn't relying on this, and it could at least try and make some sort of rough estimate. And it didn't do either of those. So I think setting those aside, which I do think the SEC has to defend itself on the grounds that it was given, and it clearly didn't engage in this sort of lengthy analysis in the rule itself, I would turn to point four, which is essentially the staff memo point. I know they say that— You can wrap it up in one sentence. Oh, sorry, I'll condense my points. The staff memo, I think, yes, they said they engaged in its own analysis. The SEC engaged in its own analysis. But when you look at what the rule was actually discussing in pages 104 through 107, all it does is just rely on the staff memo. Finally, just turning to the remedy question— Your time has expired. Thank you. The case is under submission, and the Court is adjourned.